L4TsCHEc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LOGAN CHENG,

4                    Plaintiff,

5            v.                              20 Civ. 5678 (KPF)

6    WENGUI GUO,

7                    Defendant.

8    ------------------------------x
                                            New York, N.Y.
9                                           April 29, 2021
                                            10:00 a.m.
10
     Before:
11
                    HON. KATHERINE POLK FAILLA,
12
                                            District Judge
13
                            APPEARANCES
14
     RANDAZZA LEGAL GROUP PLLC
15        Attorneys for Plaintiff
     BY:  JAY M. WOLMAN
16        MARK RANDAZZA

17   SCHULMAN BHATTACHARYA LLC
          Attorneys for Defendant
18   BY:  JEFFREY S. GAVENMAN

19

20

21

22

23

24

25

L4TsCHEc

| 1 | (The Court and all parties appearing telephonically)

| 2 | THE DEPUTY CLERK:  Counsel, please state your name for

| 3 | the record, beginning with plaintiff.

| 4 | MR. WOLMAN:  Good morning, your Honor.

| 5 | This is Jay Wolman at Randazza Legal Group for

| 6 | plaintiff Logan Cheng.

| 7 | THE COURT:  Good morning, sir.  Thank you.

| 8 | MR. RANDAZZA:  Good morning, your Honor.

| 9 | This is Jeffrey Gavenman, and I have Sabrina Schiller

| 10 | on the line from my office.  We're from the firm Schulman

| 11 | Bhattacharya and represent Defendant Guo.

| 12 | THE COURT:  Thank you to you as well.

| 13 | All right.  I appreciate your willingness to

| 14 | participate in this conference telephonically.  In my prior

| 15 | endorsement of the 22nd of April, I resolved what, for me, was

| 16 | the issue regarding the implication of the Fifth Amendment

| 17 | privilege against self-incrimination, and I did want to discuss

| 18 | today, because of that resolution, the issue of the

| 19 | attorney-client privilege.

| 20 | Just to note some things in Mr. Wolman's letter of

| 21 | yesterday afternoon.  Mr. Gavenman, have you received that

| 22 | letter?

| 23 | MR. GAVENMAN:  Yes, I did, your Honor.

| 24 | THE COURT:  OK.  Thank you.

| 25 | Because I'm hoping you'll be responding to it this

L4TsCHEc

morning.  Let me just note something because of my resolution

of the Fifth Amendment issue.  The first footnote, I think, is

a question of judicial documents and the presumption of public

access to such documents.

        Mr. Wolman, I wasn't sure what you were trying to get

out here in this footnote.  If what you want me to do is make a

more robust finding regarding why I am not disclosing this

information, I will do so.

        But let me ask you, what is the purpose of your

footnote one?

        MR. WOLMAN:  Thank you, your Honor.

        There are certainly two purposes.  One is to find out

what was filed with the court ex parte and in camera under

seal.  Two, then to get a better understanding to make a record

for potential further review of your Honor's order because,

again, some of the basic questions that were asked at the

deposition where the Fifth Amendment was invoked was what even

is the investigation or charges pending.  This is, of course,

information already in the hands of the government, if they are

investigating or charging.  It would not be, in our opinion,

privileged in any way.  There would be no confidentiality to

Mr. Guo to that effect.

        So both to know what was submitted, to the extent that

material itself does not self-incriminate, but is otherwise

available for public inspection under Brown v. Maxwell, and to

L4TsCHEc

1    then be able to, as I said, set up a record for appellate

2    purposes.

3              THE COURT:  I see.

4              Mr. Gavenman, do you wish to speak to the issue of

5    what you submitted to me, or do you wish me to speak to the

6    issue, sir?

7              MR. GAVENMAN:  Well, I'd be happy to have you speak,

8    Judge.  Whatever you would like to.  Certainly, as your Honor

9    knows -- I don't want to get into the details of it, but as

10   your Honor knows -- there was sensitive information submitted,

11   and I think there was a robust showing of why it was invoked

12   and the need to keep it sealed.

13             So I certainly understood the court to continue to do

14   that.  If the issue -- it is going to be difficult to brief the

15   issue without revealing additional information.  I think there

16   has certainly been a showing for why the information need to be

17   sealed, and the harm there would be if it was not kept sealed.

18             THE COURT:  Mr. Wolman, let me explain to you what I

19   am comfortable explaining to you.

20             I did receive an in-camera submission that included a

21   letter from counsel and a sworn statement from counsel.  I'm

22   not going to note specifically which counsel, whether there was

23   more than one, but there was a very detailed recitation,

24   historical recitation, of investigations and matters that made

25   clear to me, number one, that this is an appropriate invocation

L4TsCHEc

1   of the Fifth Amendment, and secondly, that disclosing the

2   details of any investigation or investigations would very

3   likely compromise them, which is why I am not doing it.

4          So that is what I can tell you.  I got a letter.  I

5   got a sworn statement from counsel.  I can tell you, as well,

6   that they were very, very detailed, and that upon reading them,

7   I did feel comfortable with Mr. Guo's invocation of the Fifth

8   Amendment privilege.

9          That's what I'm comfortable say, sir, because I'm not

10  interested in compromising investigations by other authorities.

11         MR. WOLMAN:  May I inquire, your Honor?

12         How does it compromise an investigation where Mr. Guo

13  already knows about the existence thereof?

14         THE COURT:  Sir, I'm not going to answer that

15  question.  You have the record that you have, and if you wish

16  to take it up, you know how to do so.

17         But you've suggested that these are judicial

18  documents.  The deposition, when included as an exhibit to a

19  letter, may be a judicial document.  But an in-camera

20  submission that I sought to substantiate a Fifth Amendment

21  self-incrimination privilege is not something that, to me, to

22  give further detail would actually undermine the privilege,

23  which is not something that I'm interested in.

24         I'll also note that, in the Brown decision that you

25  have cited to me, they have themselves left open the

L4TsCHEc

possibility of this happening.  For example, footnote three of

that decision indicates that the presumption of public access

does not apply to material that -- excuse me, footnote 33,

presumption of public access does not apply to material that is

submitted to the court solely so that the court may decide

whether that same material must be disclosed in the discovery

process or shielded by a protective order.

So, again, sir, I appreciate that you want more

information.  You're not getting it out of me.

MR. WOLMAN:  I understand, your Honor.

I should note, for the record, you know, our firm and

myself actually represented one of the litigant interveners who

appear and argued in Brown v. Maxwell and has been involved

with Judge Preska's unsealing process in the Giuffre v. Maxwell

matter, and I would beg to differ as to the submissions not

being judicial documents.

They do inform your Honor's decision as to whether or

not the Fifth Amendment applies, not whether or not the

disclosure itself, the answers to the interrogatories, the

deposition questions or to request for production.  Those

documents are what the court is considering under footnote 33.

THE COURT:  And that is where you and will differ

then.

Let's, please, sir, move on to the attorney-client

privilege issue.  I do have your submission of yesterday, and

L4TsCHEc

1    I guess I would like to understand, as I read it, what you're

2    saying is that Mr. Guo has simply not established that the

3    attorney-client privilege shields the conversations as to which

4    he has invoked the privilege.  But even if he had established

5    it, which you believe he has not, such privilege is waived by

6    his conduct at the deposition or other conduct.

7              Do I understand your argument correctly, sir?

8              MR. WOLMAN:  There are two aspects, your Honor.

9              THE COURT:  Yes, sir.

10             MR. WOLMAN:  One is conversations with counsel,

11   specifically Mr. Podhaskie or any other attorney.  The question

12   is, has he established that this person is actually his

13   attorney?  I would submit he has not.

14             It is his burden to establish this as the person

15   invoking the privilege.  He has given no investigation.  In

16   fact, he often does not know who his counsel is.  He does not

17   have in writing or not sure what, if anything, is the scope of

18   Mr. Podhaskie's representation, when it is curious how

19   especially an in-house counsel would be providing him

20   individually advice.

21             I know he has an association with Golden Spring, but

22   from my own practice, typically if I'm representing a company,

23   when I'm talking to an employee, I have to give them an Upjohn

24   warning because they are not my client.  So there has not been

25   an establishment of attorney-client relationship, which is the

L4TsCHEc

1    foundation for attorney-client privilege.  He hasn't

2    established that any of these conversations where Mr. Gavenman

3    advised him not to disclose were solely in the presence of his

4    attorney, as opposed to third-party personnel from Spring.

5          And with respect to written documents, anything he has

6    received by mail, even if there is an established attorney-

7    client relationship, such as with Mr. Gavenman, if Mr. Gavenman

8    has been sending him documents by mail, for example, and

9    Mr. Guo purposely has third parties check and open his mail --

10   which he testified to that he doesn't know who is looking at

11   his mail, he leaves it for Golden Spring to pick up -- we cited

12   to his testimony in our letter, to the extent there even was

13   attorney-client privilege, now that he's giving all of his mail

14   to a third party, he has waived that privilege.

15         THE COURT:  Is there a possibility that this is a case

16   involving either a joint representation or a common legal

17   interest?

18         MR. WOLMAN:  It would be the burden of proof on the

19   plaintiff to show that of the person -- I'm sorry, the

20   defendant, the person invoking the privilege, to show that.

21   And right now, there is no evidence of that.

22         THE COURT:  This is your argument regarding the

23   establishment of the privilege.

24         With respect to the issues of waiver, what I

25   understand you to be saying is that the fact that there is a

L4TsCHEc

possibility the conversations may have taken place in the

presence of third parties, that would viciate the privilege.

And separately, that the fact that Mr. Guo has someone or

concedes that there is someone other than he opening his mail,

include potentially legal mail, might operate as a waiver of

the privilege.

        Are you also arguing that his deposition testimony

itself amounted to waiver, or is it the involvement of third

parties?

        MR. WOLMAN:  I would say it is the involvement of the

third parties that he testified to, where he just has Golden

Spring check his mail.  All of his mail, and I should say also

the documents that he is producing in this case, he produced to

Golden Spring for them to somehow process, and then it gets

produced to Mr. Gavenman, who produces it to us.  Whatever

documents are going there, because he testified that he doesn't

have any records personally.  I asked him.  He's got no

devices.  He's got no files.  Nothing.

        Whatever he gave them somehow, whatever he may have

kept, to the extent that is even consistent, he processes

through Golden Spring.  His mail goes there.  Golden Spring is

not a law firm.  There is, you know, no evidence that they've

been retained by any law firm in connection with the litigation

here.  So we see no reason why, you know, it's not just merely

a disclosure to a third party, as if you gave it to your

L4TsCHEc

1    brother.

2            THE COURT:  OK.  Let me ask you something else, sir,

3    just so that the record is clear.

4            Your letter to me of yesterday contains four different

5    spellings for the in-house counsel with Golden Spring.  May I

6    please have the correct spelling of his name so that I may be

7    referring to him correctly in this matter?

8            MR. WOLMAN:  I apologize for that, your Honor.

9            Let me see.  Daniel certainly is the normal spelling.

10   I believe it is P-o-d-h-a-s-k-i-e.

11           THE COURT:  Thank you.

12           OK.  All right.  Mr. Gavenman, why don't you begin by

13   telling me how your client established, either during the

14   deposition or in documents preliminary to the deposition, that

15   he had an attorney-client relationship with Mr. Podhaskie.

16           MR. GAVENMAN:  Yes, your Honor.

17           During the deposition, it was quite clear he wasn't

18   his lawyer and hasn't been his lawyer all along.  There is, in

19   the deposition, that was discussed and really it was not

20   challenged during the deposition.  There was not a request to

21   make a proffer about exactly what that was and, frankly, there

22   were some Fifth Amendment invocation issues anyway, since there

23   would have been that request, but it wasn't likely done a

24   motion on it.

25           There's been a reason to set forth that basis.

L4TsCHEc

Really, the footnote in Mr. Wolman's letter was the first time

this was recognized, and not even directly.  It was in a motion

to extend discovery.  It really is not a correctly teed up

issue where we have had a chance to go forward.

But there is a couple of things I want to note in

here.  One is he did say that Daniel was his lawyer and had

been his lawyer for a long time.  Another thing is this common

interest privilege question you raised.

You know, it is interesting that Mr. Wolman is

suggesting there is no basis for that, yet is trying to also

suggest there is a basis to bring in Golden Spring as an alter

ego.  Certainly those two positions are inconsistent.  If he

thinks there was a basis to bring them in as an alter ego, yet

there is no common interest, there was discussions and

testimony about the fact that Golden Spring is paying for the

litigation and some other nuggets like that.

I think there is some discussion --

THE COURT:  Mr. Gavenman, I'm going to ask you to

pause, please, sir.

MR. GAVENMAN:  Sure.

THE COURT:  Just with respect to the tension that you

just now identified.  I think the issue is that Mr. Wolman is

not saying that it could never be the case that Mr. Podhaskie

could be representing him or even could have either a joint

representation or a common legal interest.  I think what he is

L4TsCHEc

1    saying is that Mr. Guo's answers in his deposition, and the

2    other evidence that has been presented to plaintiff in this

3    case, does not substantiate either a joint relationship or a

4    common legal interest.

5           Sir, let me ask you a different question, please, and

6    that is:  Tell me about Mr. Podhaskie.  I don't believe him to

7    be on this call, or I would ask him these questions myself.

8    But is he an in-house lawyer at Golden Spring?  Is he a lawyer

9    who provides the equivalent of in-house counsel service to

10   multiple individuals and corporations?  What does he do?

11          MR. GAVENMAN:  So Mr. Podhaskie was at Golden Spring,

12   and for some time, I understand that he is not at Golden Spring

13   any longer and has not been at Golden Spring for some time.

14          My understanding is there is clients to Golden Spring

15   that he provides services to.  I can't tell you I know the full

16   scope of it, but I certainly have always had the understanding

17   that he provided legal services to Mr. Guo.  It's always been

18   the understanding that I have had and my experience as well.

19          THE COURT:  Did you happen to notice the Vanguard

20   article regarding Mr. Podhaskie?

21          MR. GAVENMAN:  I did.

22          THE COURT:  Is that the same gentleman?  Are we

23   speaking of the same person?

24          MR. GAVENMAN:  It is.  In fact, in that article, it

25   speaks of his client, and not just singular client in-house,

L4TsCHEc

1   but clients he serves while he is in that role.

2          THE COURT:  Yes.  I guess I'm trying to understand

3   that particular role that he has.

4          Please, sir, I realize that you are not he and that

5   you know what you know about his job and you don't know what

6   you don't know about his job.  But is he sort of an in-house

7   counsel to multiple corporations and individuals, or are they

8   somehow related to each other?

9          Does he sort of serve as an in-house counsel for

10  limited purposes?

11         I'm just trying to figure out what he does that allows

12  him to claim attorney-client relationships with multiple

13  entities and individuals.

14         MR. GAVENMAN:  Understood, your Honor.

15         Couple things.  One is, I can't tell you that I know

16  the full scope, and I need to be cautious about saying things I

17  don't know.  The other thing is there is some Fifth Amendment

18  issue that exactly how this goes together.  I think me making

19  representations about what he does and what he does for Mr. Guo

20  runs into those issues.

21         Certainly, if it is ex parte, perhaps we could get

22  into that a little more.  But this certainly has, you know,

23  represented, I think there was testimony in the Pacific

24  Alliance case -- I'm sorry -- in the Eastern Profit case that

25  just occurred in the Southern District about him being his

L4TsCHEc

attorney as well and being a long-time attorney.

I think that has -- I don't really know how that all shapes up, and I think to the extent there is some particulars about that, I probably should not make representations about it, both to lack of knowledge and also because of the Fifth Amendment issues.  But certainly there was testimony about him being his lawyer.

THE COURT:  Well, see, as respectful as I have been of your client's Fifth Amendment assertion, insofar as it went to relationships between and among him and certain corporate entities, I'm not sure that I would permit an in-camera submission in order to substantiate an attorney-client privilege.

Now, it may be ultimately that you want to think about how you're going to substantiate it and then prepare something accordingly and submit it to me.  Because I recognize that you may have been blindsided somewhat by the lateness of the submission from Mr. Wolman.

But you're telling me that there was the trial in the Eastern Profit case, I believe that was before Judge Liman in the last couple of weeks, and that there is testimony from someone regarding Mr. Podhaskie's attorney-client relationships.

So how am I to understand or, if you will, how is your client to prove that he has an attorney-client relationship

L4TsCHEc

1    with Mr. Podhaskie that is either of a joint client or a common

2    legal interest type and that it has not been waived?

3         MR. GAVENMAN:  Well, I'll speak to the second part of

4    the question first and then back to the first.

5         I think it is actually really important to have the

6    context of where we are here.  So there was actually almost no

7    testimony that this privilege is relevant, that Mr. Podhaskie's

8    discussions with Mr. Guo are relevant to what we're doing in

9    this proceeding.

10        In fact, most of the time that there was a discussion

11   about attorney-client privilege, it was involving other

12   litigations that he had.  Counsel that made appearances for and

13   was not Mr. Podhaskie has not been in the line of inquiry.

14        The only time there was a discussion, the only time it

15   was discussed and the privilege was invoked was in whether or

16   not he had a discussion with Dan about this case in Nevada.

17   And then a second time, it was asked again, and Mr. Guo said he

18   just didn't recall, simply didn't recall the discussion or the

19   contents of the discussion.

20        As for the mail issue, the suggestion that

21   Mr. Podhaskie or someone at Golden Spring opens all his mail

22   simply was not what was testified to.  Mr. Guo said that was

23   not necessarily the case, that Golden Spring opened all his

24   mail, at 55, line 14 through 17.

25        But much more importantly, Mr. Wolman kept slipping in

L4TsCHEc

this idea that there was legal communications coming to Mr. Guo

through the mail.  If you look at the transcript, those legal

communications are from the Randazza Legal Group, opposing

counsel.  There is no suggestion, no testimony, no record that

he was receiving what should have been privileged communication

from me or anyone else through the mail that were then being

intercepted by Mr. Podhaskie.  There is no record for that, and

as far as I know, that has never happened.  That is not even at

issue.  All we have is this one conversation, and Mr. Guo later

then testified he didn't even recall that issue between him and

Mr. Podhaskie.  So this is a very small issue that is not

really at issue in the case.

Now, I was surprised by the submission last night.

And also, it is my opinion in a footnote somewhere, this issue

really had not been teed up, to the extent your Honor, even

though despite the stake I just mentioned, wants to have a

submission, I will have to think about how to do that given the

Fifth Amendment issues.  But there certainly is testimony that

he his attorney, there is testimony about certain aspects of

the common interest that Golden Spring may have, so I do think

there is a basis.  And I think this is sort of a sideshow along

the lines of what Mr. Cheng's attorneys have been trying to do

to try to rip apart and open up Mr. Guo's life and get into

every aspect of it, which we have seen really throughout the

case.  It is not really germane to the issues that they need to

L4TsCHEc

1    prove.

2            THE COURT:  Mr. Gavenman, you do communicate with

3    Mr. Guo, do you not?

4            MR. GAVENMAN:  I do.

5            THE COURT:  Do you do so by mail?

6            MR. GAVENMAN:  I have never once communicated with him

7    by mail.

8            THE COURT:  All right.  I don't know if you would know

9    how Mr. Podhaskie communicated with him, so I am not going to

10   ask you to make those representations.

11           Mr. Wolman, I am returning --

12           Well, Mr. Gavenman, it is highly likely that at the

13   end of this conversation I will ask you for a submission, in

14   whatever format you think appropriate, regarding the

15   attorney-client privilege.  And when I say that, when I say the

16   term with whatever format you think appropriate, I'm really

17   speaking to its length, its contents, and its structure.  I

18   don't see the need for an in-camera submission.  But you may be

19   able to persuade me otherwise.  I'm just not sure that I see it

20   on the issue of Mr. Podhaskie's representation of Mr. Guo.

21   Among other things, I would imagine that even if Mr. Guo

22   believed reasonably that he had an attorney-client relationship

23   with him, those communications might be privileged.

24           But, Mr. Wolman, returning to you, it is my concern

25   that by hitting the issue of attorney-client privilege so hard,

L4TsCHEc

1    you're trying to circumvent my decision on the Fifth Amendment

2    issue, which I'm sure you don't want to do.

3         So when we're talking about the attorney-client

4    privilege and its waiver, what specifically do you think you're

5    going to obtain?

6         For example, on the issue of mailings, is it your

7    contemplation that you'll be asking Mr. Guo to produce every

8    attorney-client communication that was received by mail?

9         MR. WOLMAN:  Potentially, your Honor.  And may I also

10   state that, while I'm not trying right now to undo your Honor's

11   Fifth Amendment ruling, it can't be used both as a shield and a

12   sword.  When one invokes a privilege, this often is an adverse

13   inference.  So here, if he is able to successfully invoke the

14   Fifth Amendment and shield even establishing the

15   attorney-client relationship, then there should be an adverse

16   inference that there is no attorney-client relationship or that

17   there has been a waiver.  He can't have it both ways.  He

18   cannot use it in both aspects.

19        THE COURT:  Mr. Wolman, you're not listening to me, so

20   I'll try to be more clear.

21        As I thought I was making clear in my communications

22   with Mr. Gavenman, whatever concerns I have that led me to

23   agree with Mr. Guo regarding his Fifth Amendment assertions are

24   not necessarily things that are resonating with me in the

25   attorney-client privilege analysis, and that is why you just

L4TsCHEc

heard me say to him that I was disinclined to allow him to

substantiate the attorney-client privilege through an ex parte

submission or something that would be bound up in the Fifth

Amendment.

What I'm saying is, when you're talking about the

waiver of the attorney-client privilege, I'm not sure

specifically -- or the failure to establish an attorney-client

privilege, I'm not sure specifically what you think you're

getting out of that.  So that is why I'm asking about the

question of the mail.

If what you're saying is you believe that the

transmission of mail and the possibility of periodic review of

the mail by the Golden Spring entity or any third party amounts

to a waiver of those privileged communications, then perhaps

you would be able to request whatever legal communications

Mr. Guo received by mail at Golden Spring that were opened up.

According to Mr. Gavenman, at least from his perspective, that

amounts to none.

But other than the mail issue and the possibility of

this single communication or communications with Mr. Podhaskie

regarding the Nevada litigation, I'm not sure what else, what

are the other subject matters that you believe you get to

inquire into because of deficiencies in establishing or the

fact of the waiver of the attorney-client privilege?

MR. WOLMAN:  Thank you, your Honor.

L4TsCHEc

1          First, I would suggest that the information already

2     has been requested.  I do not need to make a new request.  To

3     the extent it has already been withheld, you know, that is the

4     issue at hand.

5          With respect to written documents, our written

6     requests were as broad as the court permitted and, you know, as

7     your Honor knows, we had to narrow them a few times.

8          We did ask for information.  The parties agreed that

9     it would not be required to include attorney-client privileged

10    responses.  But now we're finding out, at the deposition, that

11    these are not necessarily privileged or that the privilege has

12    been waived.

13         Perhaps Mr. Gavenman does not communicate by mail.  We

14    know that he, Mr. Guo, testifies that he has no e-mail.  So

15    even billing records, your Honor, does Mr. Gavenman never bill

16    anybody is a question here.  Does it never go to the client?

17    He's got a duty of communication that I'm sure he is abiding,

18    and that typically includes writing.

19         Then there is the Nevada law firm that we're talking

20    about that prosecuted Mr. Cheng.  We don't know that they never

21    communicated by mail, if all those communications go into

22    Golden Spring, and we have also submitted information that

23    shows that serial litigation to silence his enemies is part of

24    a pattern and practice of Mr. Guo, and we've inquired as to

25    that and those documents should be producible.

L4TsCHEc

1          The question we have then, and presumably this mail

2   has been withheld, to the extent that there is tactic of doing

3   so, that tends to show the necessary ill will in order to

4   establish a claim for punitive damages, which is in this case.

5   So that he has a pattern and practice, not just of doing it

6   against Mr. Cheng, but this is what he does to everybody who he

7   claims to be his enemies.  And filing multiple suits on the

8   same day, those communications would tend to be admissible in

9   this case.

10          So there is that aspect.

11          THE COURT:  Sir, excuse me.  Sir, thank you for not

12   cutting me off.

13          If we could just go back to the issue you were just

14   saying about the communications regarding the pattern and

15   practice that you have alleged by Mr. Guo issues serial filing

16   in order to silence his enemies.

17          Let's imagine he had a conversation with attorneys,

18   and as a consequence of those conversations, he filed multiple

19   lawsuits in a day, as he did.  Is it your suggestion that those

20   communications are subject to disclosure because no privilege

21   attached because Mr. Guo has not demonstrated that a privilege

22   attached or because any privilege that attached has been

23   waived?

24          MR. WOLMAN:  If there are oral communications

25   potentially in the presence of a third party, they would not

L4TsCHEc

1    have attached.  If we are talking about written communications

2    from his counsel all over the country who probably, at least

3    one of them is going to be mailing him, then we're talking

4    about a waiver issue.

5          THE COURT:  I see.  Based on the deposition testimony

6    that you took, what did you understand to be Mr. Guo's

7    communications with counsel antecedent to the filing of those

8    lawsuits?

9          MR. WOLMAN:  Well, the problem is, your Honor, that

10   Mr. Gavenman repeatedly responded to my questions with an

11   admonition to his client not to disclose any attorney-client

12   information.

13         THE COURT:  Of course, and I would have done the same.

14         But did he, at least, did Mr. Guo recall speaking with

15   counsel preliminary to these filings?

16         MR. WOLMAN:  It is unclear, your Honor, because

17   Mr. Guo couldn't remember any attorney's name, except for

18   Daniel Podhaskie.

19         THE COURT:  I see.  OK.

20         You were about to say something else?

21         MR. WOLMAN:  He didn't even know Mr. Gavenman's name

22   properly.

23         THE COURT:  OK.  All right.  Sir, you were going to

24   say something else before I asked my followup question.

25         MR. WOLMAN:  As I was saying, the invocation of

L4TsCHEc

1    privilege was not limited merely or at least the admonition of

2    not disclosing anything, any privilege, coaching his client not

3    to say things, was not limited merely to communications with

4    Mr. Podhaskie.

5          We cited in our letter last night the multiple

6    instances -- and I tried each time to only give one citation

7    per question at issue -- so that appears, every single citation

8    that I referenced in the letter last night is to a specific

9    question.  It is that many questions where the admonition of

10   privilege was given.

11         THE COURT:  One moment, please, sir.

12         Mr. Gavenman, looking at the first of these cites,

13   which is page 13, line 9 of the transcript in this case, I

14   could understand your argument that your client was protected

15   by the Fifth Amendment from disclosing whether he was being

16   prosecuted by any crime.  But I don't know that -- I'm not sure

17   I could understand how he could decline to answer on the

18   grounds of attorney-client privilege.  If, for example, his

19   attorney had advised him of the fact of investigational

20   prosecution, I'm not sure that that information is subject to

21   the attorney-client privilege.

22         But let me hear from you on that, please.

23         MR. GAVENMAN:  Yes, your Honor.

24         It is my understanding -- and I certainly want to be

25   careful not to reveal anything -- it is my understanding that

L4TsCHEc

1   the discussions that were being had in the criminal context

2   were -- it was not necessarily direct communication from

3   whichever authority who was doing the discussing about the

4   exact contours of what was being investigated.  Some of the

5   discussion then led to attorney work product and thoughts, and

6   then was communicated back as to exactly what is going on here,

7   what is being investigated and what is happening.

8          So as your Honor knows, there were some things that

9   were sent out and have been required interpretation by an

10  attorney to, you know, inform what may or may not be happening

11  in the investigations, which is why I think there is a

12  privilege that Mr. Guo could not testify to.  The only real

13  understanding he has about what is going on is through this

14  filter of an attorney interpreting and then communicating to

15  him what his thoughts and his legal handiwork from the legal

16  acumen about where these things may or may not be going.

17         THE COURT:  All right.  One moment, please.

18         (Pause)

19         Thank you.

20         Mr. Gavenman, it would seem to me that I see the

21  invocations -- let me say that differently.  I see the

22  instructions that you're giving him, and in some cases, I see

23  what you're saying is there are questions that might call for a

24  yes-or-no answer.

25         I'm just looking, for example, at the top of page 25,

L4TsCHEc

1    when he was simply asked whether he signed something in the

2    presence of Mr. Podhaskie, you cautioned him to not reveal any

3    attorney-client communications in the answer, which I suppose

4    is your right.  But it seemed to me that that was a yes-no,

5    answer.  That could be done without revealing attorney-client

6    communications.

7          So in some of the instances in which you are

8    instructing your client, I think it is -- well, I don't know

9    that it is inappropriate to do so.  But some of these just,

10   again, seem to call for non-privileged information.  Perhaps

11   you're just being extra careful with your client.

12         But there remains the issue of whether or not an

13   attorney-client privilege has been established or whether

14   Mr. Guo had a reasonable belief that he had an attorney-client

15   relationship.  So if you would like to speak to that in writing

16   rather than on the fly today, that is fine.  I'll let you do

17   that.

18         Is that what you wish to do so, sir?

19         MR. GAVENMAN:  Yes, your Honor.  Thank you.

20         THE COURT:  OK.  May I imagine that I'll receive

21   something at the end of next week?

22         MR. GAVENMAN:  Absolutely.  Absolutely.

23         THE COURT:  OK.  Thank you.

24         MR. GAVENMAN:  OK.

25         THE COURT:  OK.  Mr. Wolman, if I put to the side the

L4TsCHEc

1    attorney-client privilege topic, because I don't feel that

2    I can speak authoritatively to it in the absence of the

3    information that I do not have.  I think where we are now is

4    that your client is seeking third-party discovery and your

5    client is seeking the possibility of impleading.  But that is

6    where I was turning my intentions next.

7           But are there other issues that you believe I should

8    be addressing first?

9           MR. WOLMAN:  No, your Honor.

10          Certainly there would be consequences to the Fifth

11   Amendment invocations in terms of inferences, or if your Honor

12   allowed attorney-client privilege to certain aspects that may

13   need to be discussed, you know, either now or down the road.

14          THE COURT:  Well --

15          MR. WOLMAN:  But --

16          THE COURT:  -- no.  If I find that he can invoke the

17   Fifth, it is a general consequence of such an invocation in a

18   civil case that there are adverse inferences that can be drawn.

19   I'm not sure that today you and I need to identify what all of

20   those adverse inferences are.  But I do agree that that tends

21   to happen when one invokes in a civil case, that adverse

22   inferences can be drawn.

23          I'm not sure we should be -- I guess I would like to

24   understand your belief about adverse inferences being drawn

25   from the invocation of the attorney-client privilege.  Perhaps

L4TsCHEc

it is what we were talking about earlier, that if the

invocation is somehow itself bound up in the Fifth Amendment

invocation, that there would be an adverse inference.

But otherwise, are you, apart from that, suggesting

that an invocation of the attorney-client privilege results in

an adverse inference?

MR. WOLMAN:  I mean, I would suggest that it goes --

we would need to address any individual issue versus whether or

not it is just, you know, simply forcing us to explore in

another direction.  Because as your Honor indicated, we are

looking to now have to take third-party discovery, and

certainly the scheduling order and the processing of the case

indicates that there is a certain order.

Your Honor's order has a formal standing order or

formal format of a scheduling order has where you have to first

do written discovery to a party, then you do their depositions,

and only then can third-party discovery take place.  Certainly

here, we would not even have anticipated the need for

third-party discovery until, you know, we learned at the

deposition the full extent to which Golden Spring may be an

alter ego or may be involved in conspiracy liability or maybe

have vicarious liability or may have even direct liability to

our client, such that -- arising from the same transactions to

this suit, giving rise to it.

So we do need to explore their role.  And I don't know

L4TsCHEc

1    if they are claiming any Fifth Amendment privilege, but

2    certainly we should be permitted to take discovery from them

3    and potentially related entities to fully establish their

4    involvement in Mr. Guo's litigation against our client and

5    potentially tied to his patent practice of using litigation as

6    a weapon against third parties.

7            THE COURT:  And yet I believe your adversaries are

8    telling me that you knew, as of the payment of the judgment in

9    the Nevada case, that Golden Spring was involved because it is

10   Golden Spring who wrote the check.

11           First of all, is that true?

12           Is it Golden Spring who, on his account, the check was

13   drawn?

14           MR. WOLMAN:  It was a wire transfer, I believe, from

15   Golden Spring.  But as we indicated --

16           THE COURT:  Yes.

17           MR. WOLMAN:  -- the mere payment there doesn't

18   necessarily mean that they were the ones paying it, as opposed

19   to merely providing some kind of assistance or even a bridge

20   loan of the funds, as opposed to being the ones behind the

21   litigation, paying for everything.  Those are two different

22   things.

23           THE COURT:  Thank you.  I can appreciate that.

24           Mr. Gavenman, let me hear from you on the point of

25   third-party discovery.  I've already raised your issue about

L4TsCHEc

them knowing or not knowing about the involvement of Golden

Spring, and Mr. Wolman has just told me why he could not have

known and could not have been expected to know the degree of

interrelationship until the deposition of Mr. Guo.

MR. GAVENMAN:  Your Honor, first and foremost, I think

it is important to recall that discovery is not a free fishing

expedition to explore other claims you may want to make.  It is

only to make proportionate requests relevant to the claims you

already have.

It is clear Mr. Wolman is suggesting he now wants to

go and find a new claim and go find evidence of this new claim.

It is not the case that we have here.  And the discovery,

cracking open other outside entities and engaging in, you know,

third-party discovery for months, he has talked about 70 days

and forensic experts and the cell providers.  There was no

limited request here.  This was cracking open everything and

engaging in third-party discovery unlimited for quite a while.

And there just simply is no need.

It's been known to him that there was four actions

filed on the same day.  That is not surprising.  It is known to

him that they paid certain expenses.  I mean, it's just --

THE COURT:  No, Mr. Gavenman.  Stop right there,

please.

MR. GAVENMAN:  Sure.

THE COURT:  According to Mr. Wolman, it wasn't known

L4TsCHEc

to him.  It wasn't known until the deposition that Mr. Guo's

every expense was being paid for by Golden Spring.  I won't

recount the litany of things that he said was paid by Golden

Spring.

          So what he is saying is, it is one thing to see a

check with some other entity's name on it and think, oh,

perhaps there is a relationship or perhaps this entity is just

being used for one reason or another.  But what he is saying

is, when he actually wanted to get into the question of

Mr. Guo's assets, he found at the deposition that, to the

extent that Mr. Guo was answering these questions and he wasn't

always, he was suggesting that everything was being paid for by

Golden Spring.  That is, to put it nicely, a very unusual

relationship.  And what he is saying is, if he is trying to

ascertain Mr. Guo's assets and Mr. Guo keeps saying, Everything

I have comes from Golden Spring, he should be entitled to take

discovery of the Golden Spring entity.  This isn't as much of a

fishing expedition as you think it is.

          So tell me why he can't do it.

          MR. GAVENMAN:  He did receive three separate wires

from Golden Spring, each time from Golden Spring, for large

amounts of money.  I do think it is a fishing expedition.  The

fact that Golden Spring paid for certain expenses, that doesn't

mean there is an anti-SLAPP -- I'm sorry, there is an action,

Count One is brought on anti-SLAPP grounds.

L4TsCHEc

1          It is clear that Mr. Guo brought that case.  He was

2     the plaintiff.  So they are saying he lost one and is now

3     entitled to certain recovery, but Golden Spring doesn't get

4     involved there.  So for the prosecution of Count Two, there

5     just is no reason why the third-party discovery would go to

6     Mr. Guo's motivation, which really isn't even an element

7     either.  This is -- you know, they know certain pieces, but

8     there is no need to know those pieces or anything more.  This

9     is solely about what Mr. Guo was doing and thinking.

10          The only counts there are in this case, and going up

11     and opening up bank accounts, to the extent this is about his

12     assets, that is where I offered Mr. Wolman, before he made his

13     motion to discuss an adverse inference.  I think there

14     certainly is a right to an adverse inference about his assets.

15     And I said in my e-mail to him that we should talk about it.

16     You can get, without having to go through this large discovery

17     exercise of months and months of time, I'm willing to talk

18     about this adverse inference.  I think you're entitled to one.

19     Let's discuss.

20          Instead, he filed this motion 30 minutes later and

21     never once picked up the phone and decided to talk to me about

22     this issue, you know, which really shows the pattern that we've

23     been trying to show the court over and over again.  This isn't

24     about the needs of this case.  It is about either harassing

25     Mr. Guo or opening this up for other people who may want to see

L4TsCHEc

1   this information.

2              If it is just about assets, we're happy to talk about

3   the adverse inference.  Certainly, we pointed out the Nevada

4   statute to show that is not really until the second phase of

5   this action.  They can't even introduce this evidence about the

6   assets until after liability has been established.

7              So I don't think there is any need to going cracking

8   open third parties when the adverse inference will do.

9              THE COURT:  But what does this adverse inference look

10  like?

11             It is an adverse inference Mr. Guo has substantial

12  assets, but they are all shielded by being put in the name of

13  Golden Spring.  I mean, what is the adverse inference?  Because

14  he is trying to figure out Mr. Guo's assets, and according to

15  him, he is being stymied because whenever he has asked about

16  it, Mr. Guo has said either that Golden Spring owns everything

17  and controls everything and provides him everything or that --

18  and further, that he can't speak anymore about it without

19  implicating his Fifth Amendment right against self-

20  incrimination.

21             So how is the adverse inference going to help the

22  plaintiff in this case?

23             MR. GAVENMAN:  So, your Honor, the only reason his

24  assets are at issue is for the punitive damages question.  They

25  are not just -- the discovery requests and his interest in

L4TsCHEc

1     these things had to be tethered to something, some element he

2     needs to prove, something he has to show, some relevant piece

3     to this litigation.  And the only reason his assets are

4     relevant is for this punitive damages question about what is

5     Mr. Guo's net worth.

6            So I think the adverse inference -- and we can discuss

7     it as it goes along, I'm not sure that discussing it, you know,

8     now is perhaps other issues will come up.  I'm sorry.  I'm

9     trying to say other issues may come up.  We can discuss the

10    contours of it.  I think, as we sit here today, that is the

11    only way it is relevant.  And the adverse inference would look

12    something like, you know, he has lack of assets, that is the

13    inference that can be drawn, or he is a billionaire.

14           We can discuss exactly what the contours of that might

15    look like and how far it needs to go.  But that's the only

16    question that is relevant here, this issue of punitive damages

17    and what his assets are for that question.

18           THE COURT:  Yes.  Just so that I'm clear, sir, I mean,

19    the reason we're having this conversation at this moment is

20    that Mr. Wolman believes that discovery is necessary.  And so

21    I was a little bit concerned when you said you weren't sure

22    precisely what the adverse inference, what form it would take,

23    and that more things may have to happen or that there might be

24    other developments.

25           Because I think what you're trying to say is that the

L4TsCHEc

adverse inference obviates the need for any third-party

discovery, and I'm just trying to drill down as to why.

MR. GAVENMAN:  I certainly do think that, and I was

only trying to allow for the possibility that if there is other

issues that come up and need an adverse inference, they can be

discussed.  I surely don't see them as we sit here today.

This is a very limited case, right.  There is not that

much -- there is not many legal questions, not many factual

questions.  It is a Very limited case.  Not much by way of

damages.  It is really this fairly narrow issue about what

Mr. Guo's motivations -- I'm sorry -- whether or not he acted

with mail suppression or fraud is sufficient to show that he

needs to be assessed punitive damages.  And then it moves to,

perhaps, this other phase about what those punitive damages

should be.  Then we get to the question of assets.

So I think the only way any of this third-party

discovery that Mr. Wolman has discussed becomes relevant is to

that single question, and that single question can be resolved

cheaply and easily and convenient and savings of all by giving

the adverse inference about what the assets are, Mr. Guo's

assets.

THE COURT:  Mr. Gavenman, you heard Mr. Wolman and

I speak earlier about adverse inferences implicated by your

client's invocation of his Fifth Amendment privilege against

self-incrimination.

L4TsCHEc

1          Do you agree that invocation of the Fifth would, in

2    fact, implicate an adverse inference?

3          MR. GAVENMAN:  I do, your Honor.  That is why I

4    approached Mr. Wolman about it.  I think that is correct.

5          THE COURT:  OK.  But isn't that adverse inference

6    regarding the propriety of punitive damages rather than their

7    amount?

8          MR. GAVENMAN:  No.  I certainly don't think so, your

9    Honor.  I think it is only to the question of what his assets

10   are.  I don't think there was ever invoked in a way that

11   suggests he acted with malice.  I don't think that is

12   impression of fraud.  I don't think there is any question about

13   that he deflected on the Fifth Amendment.

14         Your Honor, he discussed and, frankly, tried to

15   discuss even more.  Mr. Wolman kept putting him off.  Why he

16   brought the case, what he was doing, the contours of it, why

17   was it only $15,000 in damages, why Mr. Cheng had said what he

18   said and why Mr. Guo filed the case.  I think his motivations

19   out there on the record.  He said Mr. Wolman was interested in

20   hearing about them.  You saw that the transcript was very

21   infrequently.  I don't think there is any adverse inference

22   that he acted in the way that would be the predicates for

23   punitive damages.  It is solely to the question there was only

24   really wrapped up in what his relationship was with Golden

25   Spring and how those the assets and who, maybe who, that is the

L4TsCHEc

1    portion that was invoked upon and really only goes to the

2    assets question for the amount of punitive damages.

3         THE COURT:  OK.  I appreciate your articulation of

4    your position.

5         Mr. Wolman, are you seeking discovery or are you

6    seeking impleading of the Golden Spring entity?  And if the

7    latter, we are now many, many months past the case management

8    plan's deadline for the addition of new parties.

9         If all you care about is discovery, I'll focus my

10   attention on that.  If you are thinking about impleading, I

11   want to understand that as well.

12        MR. WOLMAN:  Thank you, your Honor.

13        First, I want to address a couple things.  $15,000 was

14   a jurisdictional minimum that was pleaded.  Just like someone

15   would plead $75,000 in federal court.  It doesn't mean that

16   they are capping their damages there.

17        There is another pleading he asked for at least 50,000

18   for another aspect of Nevada procedure, and I only would

19   suggest that I stop Mr. Guo during deposition, and your Honor

20   can see where Mr. Guo was filibustering rather than being

21   evasive on his answers.

22        But in terms of your Honor's question, there is

23   discovery to be had.  It is not merely as to the amount of

24   Mr. Guo's assets.  You know, if the defendant wants to

25   stipulate that he is a billionaire or he has got 15 billion or

L4TsCHEc

1    17 billion.  I think there was some article I have seen as to

2    Mr. Guo's worth.  We can discuss that.

3               But it also goes to, as he said, his motivation.  So

4    where Golden Spring is so heavily involved in the day-to-day

5    life of Mr. Guo as to even providing his groceries, they would

6    likely have been -- or conversations had with these people and

7    mail, etc. -- there are elements here in terms of getting to

8    punitive damages, that if Mr. Guo would have acted with malice

9    and without probable cause, they would tend to have information

10   on that.  They would know that he would have potentially acted

11   in an oppressive manner.

12              These are elements that would need to be established,

13   and this is something that Mr. Gavenman even had brought up in

14   opposition to an early summary judgment process.  So these are

15   elements that need to be explored on a direct discovery as to

16   Mr. Guo's liability.

17              Now, as to joining them and impleading them as a

18   third -- as another defendant, yes, we would be looking at

19   that.  The Rule 15 would generally allow amendment should be

20   freely given.

21              THE COURT:  Yes.  But, of course --

22              Sir, stop.

23              Of course Rule 15 bends to Rule 16, where there is a

24   deadline set forth in a court order.  You would have to be

25   showing the Rule 16 standard, which is as to good cause.

L4TsCHEc

1          MR. WOLMAN:  Right.  There certainly is good cause

2     here, where the information was not disclosed and we could not

3     be reasonably expected to have understood that information.

4          Even certainly now, as we're learning, the questions

5     become and the invocation of the Fifth Amendment, there is a

6     question, if we were to try to implead them, are they an alter

7     ego?  Is this vicarious liability?  Is this conspiracy

8     liability?  Or is there a direct claim that my client would

9     have, such as for unfairness deceptive trade practices?

10          This seems to be that this may be part of a business

11     plan and that he was targeted.  One would look to taking down

12     enemies in terms of the FTC v. Juravin case down in Florida,

13     as being used where litigation is being used as an unfair trade

14     practice.

15          So while it would be for both purposes, discovery,

16     certainly to the extent that we learn information.  We would

17     like to then potentially implead Golden Spring because they

18     should be held liable, to the extent that they are behind the

19     abusive litigation brought by Mr. Guo.

20          THE COURT:  One moment, please.

21          (Pause)

22          Thank you.  Mr. Gavenman, do you want to be heard?

23          MR. GAVENMAN:  Sure, your Honor.

24          I think, once again, we have heard and reiterating

25     some points here, there is no claim now against Golden Spring.

L4TsCHEc

To the extent he says he wants to take discovery to find out
what claims he may have is just not appropriate discovery.  I
also don't think impleading is appropriate procedural tool, as
the case is postured for the plaintiff to go bring in a third
defendant on impleading grounds.  I just don't think that is
proper procedure.

            But all this to say, there really is no reason
whatsoever to have to go to the motivations elsewhere besides
Mr. Guo.  He is the only defendant in this case.  He is the one
that brought the action.  He testified at length, like he
brought the action.  There were questions about whether or not
he had discussions with some people at Golden Spring, the CEO,
number of other people.  Mr. Guo said he had not.  He had not
had discussions about this.  The only person he said he ever
discussed it with is one time with Mr. Podhaskie, and he didn't
even recall the contours of that conversation.

            I think there is a record in the deposition that
Golden Spring is not actively involved and is not driving his
motivations in any way.  He has his reasons for bringing the
case, and those were fully explained.  I think this case is
ready for trial on those grounds.  We can go and have all the
legal and factual discussions we need to have with what we have
and cracking this open.  The third-party discovery is going to
be extremely expensive, disproportionate to the needs of the
case and really is just not the case that is in front of the

L4TsCHEc

 1    court now and shouldn't be the basis for discovery.

 2              THE COURT:  OK.  Mr. Wolman, I'm going to ask you to

 3    obtain a copy of the transcript of this conference today, and

 4    if you order it, sir, I'll receive it automatically.  And you

 5    can order it with whatever speed you think is appropriate.

 6              I'm going to think about the issues, at least at this

 7    stage.  The appropriateness of third-party discovery and to the

 8    Golden Spring entity, and I'll give you a decision as promptly

 9    as I can.

10              I do also want to think about the attorney-client

11    privilege issues that have been raised today, and I'll be

12    waiting for Mr. Gavenman's letter to be received one week from

13    tomorrow.

14              Mr. Wolman, that, to me, are the issues that I wanted

15    to address in today's proceeding.  But is there anything that

16    you believe I should also address before we end this

17    conference?

18              MR. WOLMAN:  To the extent your Honor is considering

19    Mr. Guo's testimony, it needs to be considered as to whether or

20    not he is credible, and I think that needs to be considered as

21    well.  And merely taking Mr. Guo's word for it, when he has

22    clearly had his bills paid by Golden Spring, they should know

23    what is going on.  It is inconceivable that they don't.

24              So if they have information on every element of his

25    life and he doesn't know who was involved, he says he was

L4TsCHEc

1   involved with Golden Spring until prompted, apparently not

2   even -- you know, I've looked at other stuff.  I think his son

3   is on the board.  But if he's not able to say that he can

4   discuss -- he discussed this with anybody, not even his own

5   son, that screams credibility.

6          I think that the discovery here would be warranted,

7   but I don't see any other issues other than what is discussed

8   here or in terms of this general scheduling that was raised in

9   the parties' joint submission last week.

10         THE COURT:  OK.  Thank you.

11         Sir, I'm neither agreeing or disagreeing with the idea

12  that I should be considering Mr. Guo's credibility, but I do

13  appreciate that that is your view.

14         Mr. Gavenman, are there other issues we should be

15  discussing today?

16         MR. GAVENMAN:  No, your Honor, except obviously we

17  strenuously disagree that his credibility was in any way

18  strained or called into question by the deposition testimony.

19  There was 60 different litigations and no cause to talk to them

20  about this particular one.

21         I did want to point out one other thing, because it

22  also was going to his alleged credibility, which is this

23  request 83 issue, where they said he had been dishonest,

24  documents showed he was dishonest.  We showed that was not part

25  of the request.  I did want to point your Honor to ECF 40,

L4TsCHEc

1   where Mr. Wolman actually requested 83 was limited in scope

2   from the form it had at that time to documents where he

3   admitted to being dishonest.

4          So Mr. Wolman misrepresented the scope of that

5   request, even in suggesting that Mr. Guo had not produced

6   proper documents and had been dishonest in that answer.

7          That is all, your Honor.

8          THE COURT:  OK.  All right.  Well, I thank you both

9   for being so prepared today, and you'll hear from me as

10   appropriate when I receive the transcript and when I have

11   received the letter from Mr. Gavenman.

12          Thank you very much.  And continue safety and good

13   health to you, your families, and your clients.

14          We are adjourned.

15          MR. GAVENMAN:  Thank you, your Honor.

16          MR. WOLMAN:  Thank you, your Honor.

17          (Adjourned)

18

19

20

21

22

23

24

25